[No. C064815. Third Dist. May 10, 2012.]

Estates of AUGUSTUS COLLINS and ELIJAH FLOWERS, Deceased.
ANDRE FLOWERS, as Administrator, etc., Petitioner and Appellant, v.
DARYL DANCY et al., Objectors and Respondents.

## Counsel

Law Offices of Jaime Vincent Raba and Jaime Vincent Raba for Petitioner and Appellant.

Boutin Jones and Michael T. Fogarty for Objector and Respondent Wachovia Mortgage.

Daryl Dancy, in pro. per., for Objector and Respondent.

Brazil McIntyre, in pro. per., for Objector and Respondent.

## Opinion

**DUARTE, J.**—The "unclean hands" doctrine is often invoked but rarely applicable. We publish this case because it illustrates a proper application of that doctrine—and Civil Code section 3543 (section 3543), a related maxim of jurisprudence—to preclude a party from attacking an admittedly forged deed.

Augustus Collins and Elijah Flowers were brothers-in-law who jointly owned a house.[1] Elijah's son Joseph Flowers (not a party herein) had once been on the title to the house, and after Elijah and Augustus died, he apparently forged their signatures on a deed purporting to transfer the house for no consideration to defendant Brazil McIntyre. Andre Flowers (Elijah's

---

[1] Because so many persons mentioned at trial share last names, we refer to a number of people by their first names for clarity.

son and Joseph's half brother) tried to obtain control of the house, by filing an improper mechanic's lien, renting the house to a couple (the Bovets, sometimes spelled Bovettes in the record, not parties herein), and filing a quiet title action.

After Andre's quiet title action was dismissed, McIntyre's attorney advised McIntyre that she owned the house, and McIntyre deeded the house for no consideration to defendant Daryl Dancy. Dancy applied to World Savings Bank (succeeded by defendant Wachovia Mortgage), for a "quick qualifying" loan that did not require proof of income. Based on a title report that the trial court found had been negligently prepared by a now defunct title company, Wachovia made the loan to Dancy.

*After* the loan was made, Andre became administrator of the estates of Elijah and Augustus. As the administrator of those estates, Andre filed the instant probate action, seeking to quiet title and obtain other relief against defendants McIntyre, Dancy and Wachovia.

There is no dispute the deed to McIntyre was forged, and that neither McIntyre nor Dancy qualify as bona fide purchasers. But the trial court found Andre had "unclean hands" and therefore was precluded from attacking the forged deed, and denied his petition. Andre timely appealed.

■ As we shall explain, the facts, viewed in the light favorable to the judgment, support the judgment. Based on Andre's efforts to benefit from the forged deed, he is now precluded from attacking that deed. Accordingly, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Andre's Testimony and the Chain of Title*

Elijah died intestate in 1997 and Augustus died intestate in 2003. The chain of title regarding the house they owned jointly is confusing, at best.

In 1993, Karen Brockmann deeded the house to Vicky Craig and James Powe, and about a month later they deeded the property to "Elijah Flowers, an unmarried man and, [¶] Joseph J. Flowers, an unmarried man as tenant and [¶] Karen Brockmann, an unmarried woman as tenant." The next day, Brockmann gave her interest to Elijah "an unmarried man" and Joseph "an unmarried man as tenant."

In 1995, Joseph and Tamara Flowers (Elijah's wife) signed quitclaim deeds to "Eligah [*sic*] Flowers, a married man, and Agustus [*sic*] Collins, an unmarried man" and those deeds were later recorded.

In 1996, a deed of trust was recorded in favor of a federal court, covering the instant property, from "Eligah [*sic*] Flowers and Agustus [*sic*] Collins," and two other properties from "Eligah" and Tamara Flowers.

Andre testified that after Elijah died in 1997, no probate was opened because the family assumed the house belonged to Augustus, and that when *Augustus* died in 2003, "I don't know what his estate did." Before Augustus died, he became unable to care for the house and Andre discussed acquiring it from him. In his deposition, Andre conceded he realized that the failure to probate Elijah's estate earlier complicated matters.

A forged grant deed recorded on May 3, 2004, purported to transfer the house from "Agustus [*sic*] Collins, unmarried man, and Elijha [*sic*] Flowers unmarried man" to McIntyre.

Andre testified he had never heard of McIntyre until he received a utility bill or tax statement with her name. On June 23, 2004, not long after McIntyre's deed was recorded, Andre recorded a verified mechanic's lien on the property, for $75,000. The lien was defective because Andre did not have a contractor's license and had not served a preliminary notice of lien, despite his false declaration to the contrary. Further, Andre listed only Augustus as the owner—omitting Elijah—and failed to mention that both owners had already died.

On August 16, 2004, Andre and Hennessy Flowers (Andre's half brother), represented by Attorney Robert Enos, filed a complaint to quiet title *in them*, in part alleging the deed to McIntyre was forged. Andre verified the complaint. On November 17, 2005, the case was dismissed by a minute order stating "Attorney of record/party failed to appear . . . ."[2] Andre states he failed to appear due to his incarceration but there is no explanation why *Hennessy* did not appear, although Hennessy had been named as a coplaintiff "just in case anything was to happen to" Andre.

Andre denied that he rented the house to the Bovets and testified a rental agreement dated August 1, 2006, bore his *forged* signature. The agreement called for a $1,400 deposit and monthly rent of $1,200. However, the trial court found Andre *did* sign that agreement.

A deed from McIntyre to defendant Dancy was recorded on September 21, 2006. Andre testified he had never heard of Dancy until Dancy requested

---

[2] The minute order references a local rule providing for sanctions, including dismissal, for the failure to comply with local rules. Andre asserts without citation to the record that the dismissal was without prejudice, but the minute order does not so state, and Andre does not explain why it would matter either way.

access to the house for a loan appraisal. Dancy gained entry with the aid of the police, and then tried to evict Andre.[3] The house was later damaged by fire.

Andre did not seek appointment as administrator until *after* Wachovia loaned Dancy over $175,000 in January 2007. Andre claims he first learned the loan went through when he saw a June 25, 2007 filing in Dancy's eviction action, and "took swift action" by filing the instant probate petition on July 13, 2007.[4]

### Dancy's Testimony

Dancy testified he met McIntyre in 2006, they became friends, and she gave him the property—"as is"—a couple of months later because she was stressed out about it and there was a tax liability "in excess of $9-, $10,000 dollars." Before the transfer, McIntyre's attorney, Deborah Barron, told Dancy that McIntyre owned the property. Dancy did not have a title report prepared because the house was a gift. On December 15, 2006, while Dancy was on the telephone with Andre and Joseph, Andre threatened that "bullets were going to fly." Andre made many threats, requiring Dancy to "call the sheriffs out" every time he went to the house. Andre claimed he was owed $75,000 on the house, but Dancy discovered the mechanic's lien was defective. Andre also told Dancy that he would leave Dancy alone if Dancy gave him $80,000.

Dancy sued to evict the Bovets on January 17, 2007. On February 13, 2007, Andre filed a document claiming to live at the property. That is when Dancy learned that Andre claimed that the McIntyre deed had been forged. When the Bovets moved out, Dancy dismissed the eviction action against them, and filed a new one against Andre. Then, "all of a sudden, the property went up in smoke somehow."[5]

To obtain the loan on the property from Wachovia, Dancy had to pay the tax liability and fix some windows. Dancy represented to the court that he had "Well over $15,000" into the house for "taxes and repairs" and cleaning up the property after the fire.

---

[3] That eviction action has been abated.

[4] Elijah's alleged intestate heirs are his surviving spouse, Tamara Flowers, and his children, Andre, Joseph, Hennessy, Mattie Flowers, Anthony Flowers, and Elijah R. Flowers. Augustus's alleged intestate heirs are his surviving spouse, Dorothy Collins, and his son, Tavio Bell.

[5] No party argues that substantial evidence shows *Andre* set the fire. The trial court did note testimony "that the value of the property is now less than the amount owed on it."

### Dorothy Collins's Testimony

Dorothy Collins (Dorothy), Augustus's widow and Elijah's sister, testified the 1995 transaction by which her nephew Joseph quitclaimed his interest arose because Joseph needed money and wanted Augustus's name on the deed to qualify for a loan. After Elijah died, Dorothy repaid that loan. She and Augustus had not wanted to "probate the property" until her husband's son (Tavio Bell) was older because Augustus "was paying a lot of child support, and he didn't want the mother to get her hands on the money. [¶] So he wanted to wait until the son was 18 before the property was probated . . . ." Dorothy admitted she called McIntyre and told her to give the property to the estate.

### McIntyre's Testimony

McIntyre testified she first learned the property had been deeded to her when she was served with the earlier quiet title action. She knew Joseph created that deed, but did not know why he did it. She had known him about 12 years, they had had a sporadic relationship, and he owed her a lot of money, and during the quiet title action "Joseph and his family" threatened her. When that case was dismissed, she was advised by her attorney, Deborah Barron, and by a detective "at the real estate fraud department," that she was the legal owner. She did not tell Dancy about the prior action because "I didn't want to have anything else to do with it" and did not want to be bothered about it further.

### Robert Enos's Testimony

Attorney Robert Enos testified he had represented Andre and Hennessy in the quiet title action, but not at the time of the dismissal. Dancy called him on January 4, 2007, to ask about the lis pendens from the August 2004 quiet title action. Enos testified he told Dancy he no longer represented Andre, but "I also told him that you probably don't want to mess with this property" because title was based on "an impossible act, a conveyance by two dead guys."[6]

Enos testified he also received a call from *either* an escrow officer or a title officer that day, "And I told her that the case involved a transfer of title to a

---

[6] As explained later, Enos's testimony was not fully credited. Dancy testified Enos told him he no longer represented Andre, but gave him no details about the case. During Dancy's cross-examination of Enos about whether Enos admitted telling Dancy that Enos "had no business leaving that garbage [the lis pendens] out there" Enos testified he did not recall making that statement. Contrary to Andre's view, this exchange does not show Enos told Dancy about the forgery or the lis pendens. Dancy was not testifying at that point, he was cross-examining Enos; thus his question and any implication associated with it is not *evidence*.

Brazil McIntyre from two dead guys."[7] "[S]he seemed rather aghast and said there is no way that she was going to allow this escrow to close." When he spoke with her on January 8, 2007, and she asked for help in removing the lis pendens, Enos told her he no longer represented Andre. On January 18, 2007, the day *after* escrow closed, an Alliance Title escrow officer sent Enos a letter asking that the lis pendens be expunged, and Enos forwarded that letter to Andre.

### *Michael Iorio's Testimony*

Michael Iorio testified he had been a division loan manager at the time of Dancy's loan, and he knew of "issues," namely, broken windows and delinquent taxes—amounting to nearly $10,000—that were dealt with through escrow. A loan of $178,750 to Dancy closed on January 17, 2007; the bank expected to have a "first-priority" interest in the property, and would not have approved the loan otherwise. Before the loan was funded, Iorio had not known of any title dispute, and any such dispute would have halted the loan transaction. The title report disclosed the tax delinquencies and the 1996 deed of trust to the federal court, and stated that the deed from McIntyre would require an uninsured deed affidavit, which was obtained before escrow closed.

## DISCUSSION

### I

### *Standard of Review*

██ We presume the trial court's factual findings are supported by the evidence, and it is the appellant's burden to show that they are not. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) ██ A trial court sitting in equity has broad discretion to fashion relief. (*Bechtel v. Wier* (1907) 152 Cal. 443, 446 [93 P. 75]; *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 770–771 [110 Cal.Rptr.2d 861] (*Hirshfield*).) An equitable decree is reviewed under the abuse of discretion standard, under which "we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision ' "falls within the permissible range of options set by the legal criteria." ' " (*Hirshfield, supra,* 91 Cal.App.4th at p. 771; see *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1753–1754 [54 Cal.Rptr.2d 512] (*Wurzl*); *Common Wealth Ins. Systems, Inc. v. Kersten* (1974) 40 Cal.App.3d 1014, 1026 [115 Cal.Rptr. 653] [finding of

---

[7] As we explain in the Discussion, *post,* at IID., we presume that the trial court did not credit Enos's testimony that he warned Dancy or a bank officer about a deed from "two dead guys."

estoppel to deny a forgery "binding on appeal unless the contrary conclusion is the only one to be reasonably drawn" from facts].)

But a trial court's discretion is always delimited by the applicable legal standards. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].) "The discretion conferred upon the court 'is a discretion, governed by legal rules, to do justice according to law or to the analogies of the law, as near as may be.' [Citation.] That is to say, the range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted." (*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778 [25 Cal.Rptr.2d 681].) Thus, a trial court lacks discretion to misapply the law.

## II

### Unclean Hands

#### A. *Legal Basis for the Judgment*

We may affirm the judgment if the record supports any legal ground found by the trial court. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 110 [115 Cal.Rptr.2d 285] (*Schubert*).) The trial court found Andre had unclean hands, and also applied an allied maxim of jurisprudence. Because those entwined theories are supported by the record, we need not address other theories discussed by the parties or the trial court.

The parties agree that a forged deed is a nullity, even as to bona fide purchasers,[8] but that a party's conduct may estop the party from asserting the deed is forged. (*Bryce v. O'Brien* (1936) 5 Cal.2d 615, 616 [55 P.2d 488]; *Blaisdell v. Leach* (1894) 101 Cal. 405, 409 [35 P. 1019]; *Wutzke v. Bill Reid Painting Service, Inc.* (1984) 151 Cal.App.3d 36, 43–45 [198 Cal.Rptr. 418] (*Wutzke*); *Gioscio v. Lautenschlager* (1937) 23 Cal.App.2d 616, 619 [73 P.2d 1230] [forged deed "inoperative"]; cf. *Schiavon v. Arnaudo Brothers* (2000) 84 Cal.App.4th 374 [100 Cal.Rptr.2d 801] [where deed merely *voidable*, bona fide purchaser may prevail].)

But a separate—and often overlapping—principle in such cases is the "unclean hands" (or "clean hands") doctrine: "One who comes into equity

---

[8] Neither McIntyre nor Dancy qualify as a "bona fide" purchaser, which requires payment of consideration. (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 328, p. 385; *Gates Rubber Co. v. Ulman* (1989) 214 Cal.App.3d 356, 364 [262 Cal.Rptr. 630].) Dancy paid nothing, and although McIntyre testified Joseph owed her money, she did not accept the deed in satisfaction of her claim.

must come with clean hands. . . . Unconscientious conduct in the transaction may give rise to the defense." (13 Witkin, Summary of Cal. Law, *supra*, Equity, § 9, p. 289; see *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 [90 Cal.Rptr.2d 743].)

 As the trial court found, the unclean hands doctrine may prevent a party from attacking a forged deed. (*Crittenden v. McCloud* (1951) 106 Cal.App.2d 42 [234 P.2d 642] (*Crittenden*); *Merry v. Garibaldi* (1941) 48 Cal.App.2d 397 [119 P.2d 768] (*Merry*).)

In *Merry, supra*, 48 Cal.App.2d 397, when Merry learned that a relative had forged documents to encumber Merry's property, she said nothing, in order to protect the family. (*Merry, supra*, at pp. 398–400.) *Because of her silence*, the defendants who had loaned money on the property lost the opportunity to sue a bank for wrongfully honoring a check. (*Id.* at pp. 400–401.) We upheld the denial of relief to Merry, finding "[h]er agreement to conceal the crime and condone it places her in little better position than the forger himself, so far as her attack upon the legality of the transaction is concerned." (*Id.* at p. 401.) We endorsed a statement of the unclean hands doctrine—originally by Pomeroy, though we did not cite Pomeroy—as follows: " ' "[W]henever a party, who as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy." ' " (*Ibid.*; see 2 Pomeroy, Equity Jurisprudence (5th ed. 1941) Maxim as to Clean Hands, § 397, pp. 91–92.) We also emphasized that "the [defendants] were entirely innocent throughout the entire episode. They advanced the money in good faith. On the other hand, plaintiff agreed to conceal the commission of the felony . . . . In good conscience, it was the imperative duty of plaintiff to speak out. Her silence deprived defendants of an opportunity to recoup from the bank before the expiration of the statute of limitations. Equity and justice should not compel defendants to bear the loss." (*Merry, supra*, 48 Cal.App.2d at p. 403.)

A similar result was reached in *Crittenden, supra*, 106 Cal.App.2d 42, where a party's failure to object to a forgery "prevented defendant from learning the true facts at a time when he might have obtained relief and before he expended further moneys on the property." (*Crittenden, supra*, at p. 50.) *Crittenden* relied both on the unclean hands doctrine and on the related maxim of jurisprudence set forth in section 3543. (106 Cal.App.2d at pp. 49–50.) That maxim of jurisprudence states in full as follows: "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." (§ 3543.)

The trial court relied on *Merry* and *Crittenden* to conclude that although Andre did not *himself* forge the deed to McIntyre, by his actions and omissions in connection with the title to the property, he had taken advantage of the forgery and thus had unclean hands. Andre wrongfully sought to control the house by filing a defective mechanic's lien, filing a baseless quiet title action for his own benefit, and renting the property to the Bovets for his own benefit.

Further, the trial court applied the allied maxim of jurisprudence (§ 3543) just quoted.[9]

In *Wurzl, supra*, 46 Cal.App.4th 1740, property sellers were defrauded by a sham escrow set up by the buyer, which resulted in a loan acquired by FDIC. (*Wurzl, supra*, at pp. 1745–1747.) They filed a quiet title action, and in an alternate holding, the court upheld the denial of relief based on section 3543, finding that the owners were in a better position to avoid the loss, by more carefully overseeing selection of the escrow company. (46 Cal.App.4th at pp. 1752–1754.)[10]

Similarly, here the trial court found Andre knew the failure to settle the estates was creating a problem, yet he sought to line his own pockets while title remained in question.

Thus, based on unclean hands and the allied maxim, the trial court denied Andre relief and left Dancy holding title to the house, subject to Wachovia's deed of trust.

### B. *Andre's Unclean Hands Contentions*

Andre argues five distinct points in his effort to show the unclean hands doctrine was not properly applied in this case. We will discuss these five points seriatim.

1. Andre first contends the prior quiet title action was not wrongful because if that suit had succeeded, the estates would have benefitted. He

---

[9] Some early cases equated forgery with criminal conduct, and indicated this maxim would not apply in such cases. (*Burns v. Ross* (1923) 190 Cal. 269, 276–277 [212 P. 17]; *Walsh v. Hunt* (1898) 120 Cal. 46, 52–53 [52 P. 115].) However, later cases endorse its application "where circumstances are presented which establish negligence or some other misconduct by the other party, which contributed to the loss." (*Trout v. Taylor* (1934) 220 Cal. 652, 656–657 [32 P.2d 968]; see *Reusche v. California Pacific Title Ins. Co.* (1965) 231 Cal.App.2d 731, 738–739 [42 Cal.Rptr. 262]; *Asp v. Lowry* (1953) 117 Cal.App.2d 81, 85 [254 P.2d 967]; *Overton v. Harband* (1935) 6 Cal.App.2d 455, 462–464 [44 P.2d 484].)

[10] The primary holding in *Wurzl* was that the often colorfully misnamed "Dench Doom" doctrine applied. (See *D'Oench, Duhme & Co. v. F.D.I.C.* (1942) 315 U.S. 447 [86 L.Ed.2d 956, 62 S.Ct. 676].)

relies on the rule that: "The heirs or devisees may themselves, or jointly with the executor or administrator, maintain an action to quiet title to the real property of the estate against anyone except the executor or administrator." (*Reed v. Hayward* (1943) 23 Cal.2d 336, 340 [144 P.2d 561].) We agree that, on the death of each decedent, title passed by virtue of the intestacy laws. (Prob. Code, § 7000.) "When a person dies, title to his or her property vests in the heirs or devisees, subject to administration." (*Olson v. Toy* (1996) 46 Cal.App.4th 818, 825 [54 Cal.Rptr.2d 29]; see *Dorland v. Dorland* (1960) 178 Cal.App.2d 664, 669–670 [3 Cal.Rptr. 262].) But title did not vest in Andre *as an individual* in derogation of the collective rights of the heirs of each decedent. Thus, the trial court properly viewed the prior action as an effort by Andre (with vague participation by Hennessy as a nominal coplaintiff) to obtain title for himself wrongfully, in derogation of the rights of other heirs.

 Andre also contends that even if he acted wrongfully, the prior quiet title suit was unrelated to the forgery, and "would *only* impact the equitable relationship among the heirs to the estate[s]," which do not include Wachovia, Dancy, or McIntyre. Andre correctly states that unclean hands is not a principle that punishes a bad actor generally, it "applies only if the inequitable conduct occurred in a transaction directly related to the matter before the court and affects the equitable relationship between the litigants." (*California Satellite Systems, Inc. v. Nichols* (1985) 170 Cal.App.3d 56, 70 [216 Cal.Rptr. 180].) "The essence of the 'clean hands' doctrine is not that the plaintiff's hands are dirty but 'that the manner of dirtying renders inequitable the assertion of such rights against the defendant.' " (*Estate of Blanco* (1978) 86 Cal.App.3d 826, 834 [150 Cal.Rptr. 645].)

But Andre's quiet title suit alleged that McIntyre obtained title by fraud and forgery. Andre failed to sue on behalf of the heirs as a whole, and failed to prosecute the action to conclusion. Andre blames Enos for abandoning the case while Andre was incarcerated and unable to pay him. But there is no evidence as to why Hennessy failed to appear, no evidence why other heirs did not intervene, and no evidence why incarceration prevented Andre from advancing the case. (See *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 792–793 [39 Cal.Rptr.2d 47] [prisoner's right of access to courts in civil case].) The record supports the trial court's finding that the dismissal was caused by Andre's dilatory conduct.

 The result was that McIntyre *prevailed* in the quiet title action, and her attorney and a real estate fraud detective advised her that she had good title. A person is required to make a "reasonable inquiry" about title, "not an exhaustive one" (*First Fidelity Thrift & Loan Assn. v. Alliance Bank* (1998) 60 Cal.App.4th 1433, 1445 [71 Cal.Rptr.2d 295]), and it is reasonable for a person to accept the advice of counsel. (See *Century 21 Deep South*

*Properties, Ltd. v. Corson* (Miss. 1992) 612 So.2d 359, 374 (*Century 21*) [legal malpractice based on title opinion; "[r]eliance on a licensed professional to perform his work competently is [eminently] reasonable"]; accord, *DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1397–1398 [262 Cal.Rptr. 370] [advice of counsel generally shows probable cause].) Thus, the trial court could properly find that by wrongfully suing to quiet title to the house *and then* negligently failing to prosecute the case to conclusion, Andre's actions left McIntyre with apparent title to the house.

Therefore, we reject Andre's view that the quiet title suit was unrelated to the forgery: It exacerbated title confusion.

2. Andre next contends his act of renting the house to the Bovets does not show unclean hands because he made the property productive. But there is no evidence he kept rental payments in trust for all the heirs. Therefore, the record shows he wrongfully profited by the title problem.[11]

Andre also argues the wrongful act of renting the property did not touch on the rights of defendants, only the other heirs. But the rental agreement gave Andre an incentive to refrain from settling the estates. Had he acted for the estates, title would have been settled before Dancy acquired the property; thus, his actions relate directly to the harm Dancy and Wachovia would suffer if the forged deed were nullified.

3. In a claim connected to the previous point, Andre asserts he had no duty to straighten out the affairs of the estates, and in any event he acted diligently.

For the reasons discussed *ante*, we disagree with Andre's concept of duty. He relies on the following statement of law: "The owner of property is justified in relying upon his title; and he is under no obligation to proceed against all persons who may assert a hostile title, although another person might be deceived by the apparent genuineness of such hostile title." (*Meley v. Collins* (1871) 41 Cal. 663, 678.) Although we accept that an owner is not required to file a quiet title suit every time some cloud on the title crests the horizon, here Andre was *not* an owner. He was one heir out of many, yet he *personally* profited by the delay in settling the estates. The trial court properly found Andre took advantage of the situation.

Andre's second point, that he acted diligently, is based on two claims, (1) that he "aggressively asserted his right to possession in fending off two

---

[11] Andre asserts that because he rented only the "front" of the house to the Bovets and lived in the back, "the expenses associated with the property could have exceeded" any rental income he received. Because he provides no record citations to support this claim, it is forfeited. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [85 Cal.Rptr.2d 521].)

attempts by" Dancy to evict him, and (2) that he promptly filed the instant petition after he was appointed administrator of the estates.[12] But, as Andre elsewhere concedes, the unlawful detainer action did not affect *title* to the property, only possession. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 638, p. 70.) And Andre did not petition for appointment as administrator promptly after the quiet title action was dismissed in 2005. Although he knew the forged deed was still outstanding, he rented the house to the Bovets, and did not seek appointment as administrator until *after* the loan was made. Therefore, the record belies Andre's claim that he acted diligently.

4. Andre next contends Dorothy acted properly in delaying probating the estate of her husband, Augustus.

Because Dorothy is not the administrator of either estate, it is not clear how this point would benefit Andre. The trial court found members of Andre's family failed to act diligently, but the finding that *Andre* had unclean hands does not hinge on the conduct or inaction of others. Further, reading Dorothy's testimony in the light favorable to the judgment, her motive was to preclude Tavio Bell's mother from obtaining an interest to which she may have been legally entitled, stemming from child support obligations. That is a wrongful motive.

Andre also contends Dorothy's act of "failing to probate would only have hypothetically harmed Tavio and arguably Tavio's mother, both non-parties, and certainly would have nothing to do with a forgery or deed of trust depending thereupon." But the trial court could rationally infer that Dorothy, by her inaction, helped continue to cloud title, and benefitted by rendering Tavio's mother's claims progressively more stale.[13]

5. Lastly, Andre contends there was no proof Joseph forged the deed to McIntyre. But the judgment does not hinge on proof that *Joseph* was the forger. The key point, which was uncontested, was that the deed to McIntyre was a forgery.

The statement of decision does state that Andre and McIntyre "suspected" Joseph forged the deed. Assuming this finding is relevant (which it is not) the record supports it. McIntyre testified she knew Joseph was responsible and Andre conceded in his deposition that he had not asked Joseph about the deed because "once I found out he was the one who did it, I was afraid of him myself." Wachovia also points out that the forged deed contains misspellings

---

[12] Andre fails to mention that his "aggressive" behavior included threats of violence.

[13] While neither Bell nor Dorothy are *parties*, Andre himself alleges that they are Augustus's heirs, and therefore that they are persons "interested" in the outcome of this case.

similar to those in the quitclaim deed Joseph previously signed, which tends to corroborate the view that he was the forger. Thus, the record supports the trial court's finding.

### C. *Other Equitable Grounds*

Andre contends the facts do not support a finding of traditional equitable estoppel or ratification, legal theories discussed in some of the cases cited by the trial court. However, as we have explained, because we uphold the central finding that unclean hands (and the somewhat overlapping § 3543 maxim of jurisprudence) bars his action, it is not necessary to address other legal theories. (*Schubert, supra*, 95 Cal.App.4th at p. 110.)

### D. *Defendants' Alleged Unclean Hands*

Andre contends that because *defendants* have unclean hands, the trial court should not have applied the doctrine against *him*. We address his various contentions seriatim.

1. Andre first claims the earlier quiet title action gave McIntyre actual notice that the deed was forged. However, as we noted *ante*, McIntyre *prevailed* in that action, then was advised by counsel and a detective that her title was good. The trial court could find that it was reasonable for McIntyre to rely on the advice of counsel (*Century 21, supra*, 612 So.2d at p. 374) and was not compelled to find that McIntyre, even if wrong about the deed, acted in *bad faith*.

2. Dancy, too, relied on the opinion of McIntyre's counsel about title, and thereafter spent money improving the property and clearing a tax delinquency. The trial court was not compelled to find Dancy acted improperly.

Here, and elsewhere in his briefing, Andre points to Enos's testimony that he told Dancy the deed to McIntyre was forged. We now explain why we must conclude the trial court did not credit Enos's testimony on this point.

As mentioned earlier, Enos testified he made statements to Dancy, *and* to either an escrow officer or a title officer to the effect that the chain of title was defective because of a deed signed by "two dead guys." The statement of decision refers to the person with whom Enos spoke as an escrow officer, impliedly resolving one conflict in Enos's testimony. However, the statement of decision does not find Enos warned *anybody* about a forgery and does not even refer to the "dead guys" testimony.

Andre argues Enos's testimony about mentioning the forgery to Dancy and the escrow officer was "unimpeached" and therefore must be

taken as true. But Dancy *denied* Enos told him details about the case, and in any event the trial court was not required to credit all of Enos's testimony. (See *Hicks v. Reis* (1943) 21 Cal.2d 654, 659–660 [134 P.2d 788] ["Provided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted."]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].)

The statement of decision merely states Enos was told that the escrow officer knew of the lis pendens, and that Enos replied to her that he no longer represented Andre. The fact the trial court did not *explicitly* reject any part of Enos's testimony or mention the "dead guys" testimony is insignificant. (See *Ingredient Communication Council, Inc. v. Lungren* (1992) 2 Cal.App.4th 1480, 1497 [4 Cal.Rptr.2d 216] [" 'A trial court in rendering a statement of decision . . . is required only to state ultimate facts rather than evidentiary facts.' " (citation omitted)].)

Because Andre did not object to the statement of decision or propose additional findings, we must infer the trial court rejected the part of Enos's testimony about mentioning a deed from "two dead guys." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227] ["the party must state any objection [he may have] to the statement [of decision] in order to avoid an implied finding on appeal in favor of the prevailing party"]; see *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 278, fn. 4 [120 Cal.Rptr.3d 893].)

Therefore, we reject Andre's contention that Dancy was on notice about the forged deed before he took title.

3. Andre next asserts the trial court should have found the lis pendens gave Dancy (and presumably Wachovia) notice of the forged deed. We disagree.

"In effect, a notice of lis pendens ' "republishes" ' the pleadings. [Citation.] Thus a potential buyer of the property should be able to go [to] the courthouse and *look up* the documents (the pleadings) in the court proceeding which might affect title or possession of the real property he or she is thinking of buying or lending money on." (*Gale v. Superior Court* (2004) 122 Cal.App.4th 1388, 1396 [19 Cal.Rptr.3d 554]; see *Behniwal v. Mix* (2007) 147 Cal.App.4th 621, 638 [54 Cal.Rptr.3d 427].) The trial court correctly concluded that the lis pendens lacked materiality once the underlying action was dismissed. (See *Garcia v. Pinhero* (1937) 22 Cal.App.2d 194, 196 [70 P.2d 675] [when "the action wherein the notice is filed ceases to be pending and is terminated the notice of its pendency has fully performed its office and may not be relied upon to afford constructive notice that a similar action may

subsequently be instituted"]; 54 C.J.S. (2005) Lis Pendens, § 25, pp. 516–517.) The fact the dismissal was not on the merits does not change the fact that anybody checking the courthouse files after that time—such as Dancy or Wachovia—would have found *no pending* action affecting title.

4. Andre next contends Wachovia had actual notice of the forgery, but this claim is based on the part of Enos's testimony we have already explained we must infer was rejected.

5. Lastly, the trial court found Alliance Title—which went out of business and is not a party—had been negligent, and Andre contends the trial court erred by not imputing Alliance Title's knowledge to Wachovia.

Alliance Title wore two hats, acting both as the escrow holder for the loan and as the title insurer. A *title insurer's* knowledge is not imputed to the buyer, because the title insurer is not the buyer's agent. (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1869–1870 [37 Cal.Rptr.2d 63].) However, an *escrow officer's* knowledge *is* imputed to the buyer, because the escrow officer is the agent of all parties. (*In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 438–442 [110 Cal.Rptr.2d 615].) Andre asserts that because Alliance Title acted in both capacities, the knowledge of all of its employees is imputed to Wachovia.

As stated by a leading practice guide, "when the same entity acts as both title insurer . . . on the one hand, and escrow holder on the other hand, knowledge obtained as a title insurer . . . is not imputed to the principal in the escrow." (3 Miller & Starr, Cal. Real Estate (3d ed. 2010) Escrows, § 6:28, p. 6-120.)[14] We agree with Andre that the knowledge of the Alliance Title *escrow* officer should be imputed to Wachovia. However, according to the statement of decision, the *escrow* officer merely knew about the lis pendens from the dismissed quiet title action. As we have already explained, that knowledge did not carry with it notice that the deed to McIntyre was a forgery.[15]

---

[14] Andre relies on the general rule that, "An agent is under a duty to inform the principal of matters in connection with the agency that the principal would desire to know about. [Citation.] Even if the agent fails to do so, the principal will in most cases be charged with that notice." (3 Witkin, Summary of Cal. Law, *supra*, Agency and Employment, § 150, p. 195.) But the more specific rules governing title and escrow officers, discussed *ante*, apply to this case.

[15] Some title insurance policies protect against forged deeds, (see *Wutzke, supra*, 151 Cal.App.3d at p. 44, fn. 5) and in the trial court Andre asserted a policy did so in this case. But insurance does not eliminate harm; it shifts losses to the insurer, who then has subrogation rights. (See *Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1025 [6 Cal.Rptr.3d 854].) Andre has not explained how title insurance would change the equities of the parties amongst themselves.

Accordingly, Andre has not demonstrated that the trial court erred by failing to find any defendant had unclean hands.

### III

*Alleged Innocent Heirs*

Andre asserted for the first time in his reply brief that there are innocent heirs, and even if he acted wrongfully, "It would be entirely perverse that the result of such a wrong is that the innocent parties should suffer further."

■ Ordinarily, we do not entertain arguments tendered for the first time in the reply brief, in part because the other side has not had a chance to be heard. (See *Savient Pharmaceuticals, Inc. v. Department of Health Services* (2007) 146 Cal.App.4th 1457, 1472 [53 Cal.Rptr.3d 689]; *Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 808 [241 P.2d 639].)

However, we ordered supplemental briefing to consider whether Andre's conduct before he became the administrator of the estates could be charged to the estates. Dancy and Wachovia in part object that this issue was not raised in the trial court and has been forfeited.

■ We have explained before that we are free to raise issues that have been overlooked by counsel. (*Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 129–130 [3 Cal.Rptr.2d 275].) "However, 'if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at trial the opposing party should not be required to defend against it on appeal.' " (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].)

■ In this case we agree with defendants that Andre has forfeited the issue. Whether the unclean hands doctrine applies turns on the particular facts of the specific case. The doctrine "must be pleaded or called to the attention of the trial court in order that it may pass on the defense and also *to permit the person against whom it is sought to be applied the opportunity to present such evidence as might bear on that issue.*" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726–727 [39 Cal.Rptr. 64], italics added.) The unclean hands issue was squarely presented in the trial court, and Andre had the opportunity to present all the evidence on the issue he wished. Andre did not present *any* evidence that any heirs that have not aided, ratified, or acquiesced in his actions actually exist in this case.

Therefore, even were we to conclude that preappointment conduct of an administrator should not *necessarily* be charged against an estate, in order to

protect innocent heirs, Andre did not present facts showing any innocent heirs exist in *this* case, and defendants have not had an opportunity to litigate the point. Accordingly, Andre has forfeited this issue.[16]

We also observe that Andre's misconduct could have provided grounds to deny his appointment as administrator, or to remove him. (See Prob. Code, §§ 8402, 8502; Coffey's Probate Decisions: *Estate of Mahoney* (1902) 6 Coffey's Prob. Dec. 1, 12; 14 Witkin, Summary of Cal. Law, *supra*, Wills and Probate, § 433, pp. 513–514; *id.*, § 453, p. 533; Annot., Construction and effect of statutory provision that no person is competent to act as executor or administrator whom court finds incompetent by reason of want of integrity (1960) 73 A.L.R.2d 458.) Once the defense raised unclean hands, Andre could have resigned, or aggrieved heirs could have petitioned for his removal. Further, any heirs aggrieved by the judgment could have moved to vacate it, and thereby achieved party status to preserve their rights. (See *People ex rel. Reisig v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1516 [59 Cal.Rptr.3d 64].) None did.

It would be inappropriate for this court to *speculate* that innocent heirs will be harmed by the judgment, when Andre failed to raise this *factual* issue in the trial court, and where no such heirs have emerged to date.[17]

## IV

### *Other Pleaded Claims*

In addition to seeking to quiet title, the instant probate petition sought cancellation of the forged deed to McIntyre, the deed to Dancy, and the deed of trust securing the loan made by Wachovia, and sought damages for slander of title against Dancy and McIntyre, and alleged fraud.

The claims regarding the various deeds necessarily fail, because we affirm the trial court's central finding that Andre is precluded from attacking the forged deed to McIntyre.

---

[16] In part, Andre cites *Lamkin v. Vierra* (1961) 198 Cal.App.2d 123 [17 Cal.Rptr. 805] for the proposition that an administrator's appointment does not "relate back" to validate preappointment acts. But nothing in that case suggests that the preappointment misconduct of an administrator cannot be charged to an estate, nor does the case address the objection that Andre forfeited the point by failing to produce appropriate evidence at trial.

[17] We do not mean to suggest any heirs actually committed or acquiesced in any misconduct by Andre, we merely conclude Andre cannot raise the *possibility* that innocent heirs exist for the first time on appeal, to attack the unclean hands finding made by the trial court based on *evidence presented at trial*. We express no view about whether any innocent heirs may have a valid claim against Andre.

▮▮▮▮ Andre makes a stray reference to his slander of title and fraud claims, but fails to separately head and argue those theories. Accordingly, we deem them to be abandoned. (See *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263]; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 701, p. 769.) Moreover, it appears those theories hinge on whether the deed to McIntyre was a nullity, and the argument that its recordation—and Dancy's recordation of *his* deed—clouded title. (See *Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 858 [237 Cal.Rptr. 282] [slander of title elements].) Our holding, effectively validating those two deeds, vitiates Andre's slander of title and fraud claims.

V

*Conclusion as to Title*

We now clarify our holding: Dancy holds good title to the property, subject to the deed of trust securing Wachovia's loan. Neither of the estates, nor any of the heirs of decedents Augustus Collins and Elijah Flowers, retain any interest in the property. This conclusion is without prejudice to any liens or other interests that may have arisen postjudgment.

**DISPOSITION**

The judgment is affirmed. Petitioner Andre Flowers shall pay each of the respondent's costs. (Cal. Rules of Court, rule 8.278.)

Nicholson, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 25, 2012, S203475.