Filed 6/21/13  Gene M. v. Annette G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| GENE M., | |
| Respondent, | E054720 |
| v. | (Super.Ct.No. FAMRS1001434) |
| ANNETTE G., | OPINION |
| Appellant; | |
| KEVIN G., | |
| Claimant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael J. Torchia, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Stephen I. Gassner for Appellant.

Vivian T. Shallito for Respondent.

No appearance for Claimant.

Respondent Gene M. (Father) petitioned the family court to establish the paternity of his daughter, A.G. (Fam. Code, § 7630.)[1] The family court found Father is A.G.'s presumed father (§ 7611), and ordered Father and appellant Annette G. (Mother), A.G.'s mother, to participate in mediation for setting a visitation schedule. Mother appeals the family court's ruling. Mother contends the family court erred because (1) Father did not have standing to file the petition; (2) the court should have granted Mother's motion to dismiss Father's petition; (3) the court should not have considered the quality of Mother's marriage; and (4) there is "an irremediable matter of the human condition." We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Mother married Kevin G. (Husband) on September 4, 1999. At the time Mother married Husband, she had a three-year-old son, A.O. A.O.'s Father is James O. Mother and Husband have two children together, S.G. and R.G. After R.G.'s birth, in 2002, Husband had a vasectomy. Mother and Husband separated for a three-month period.

In September 2008, Mother and Father met when Mother went to Father's tanning salon to tan. Mother told Father she was "going through a divorce." Mother and Father began dating and engaging in sexual intercourse. Mother and Father went to a jewelry store together and shopped for engagement ring settings. Mother did not use birth control during the affair. Mother took a pregnancy test while at Father's tanning salon—Father had purchased the test. The test was positive. Father attended Mother's

---

[1] All further statutory references will be to the Family Code, unless otherwise indicated.

first pregnancy appointment with her doctor.  Father believed Mother was excited about the pregnancy; however, Mother was unhappy about it due to the problems it could create in her life.

Father told Mother he wanted them to be a family.  Mother said she would file for divorce from Husband.  Husband learned about Mother's pregnancy during a church counseling session.  The counseling session took place in August 2009.  Also at the counseling session, Mother disclosed she had been having a nine-month affair with Father.  Husband was upset and unhappy about the pregnancy because he knew the baby was not his due to the vasectomy.

Father loved Mother.  Father was under the impression that Mother was not planning to stay married to Husband, because Mother often texted Father, "'I love you,'" and Mother and Father looked at engagement rings together.  Father bought Mother lunches, prenatal massages, vitamins, and maternity clothes.  At an ultrasound appointment, Mother and Father learned the baby was a girl.  When the ultrasound technician announced the baby was female, Mother and Father cried together.  When they left the appointment, they went to the car, hugged and continued crying.  Once inside the car, they called Father's father in North Carolina.  Mother told Father's father, "'You are going to be a grandpa.  And it is a little baby girl.'"  Father was looking forward to the birth of his daughter.

Mother and Father made plans to meet so they could go to Mother's second ultrasound appointment together.  Mother brought Husband to the meeting.  Mother did not tell Father about her plans to bring Husband to the meeting.  When Husband saw

3

Father, Husband introduced himself to Father and told Father they needed to talk. During the conversation both men cried and said they did not know what to do. Husband told Father, "he didn't know what to think or what to do." Father responded, "'I'm at the same place, you know. I got a child coming and I can't get the truth. I don't know what is going on.'"

Father felt Mother had tried to "pit" the two men against one another. Father had paid approximately $250 for a 4-D ultrasound, so Father told Husband they should attend the appointment since Father had already paid for the service. Father, Husband, and Mother went to the ultrasound appointment; however, Husband remained outside, despite an invitation from Father to participate in the appointment.

During Mother's pregnancy, Father told people Mother was pregnant with his child. Mother updated Father on the progress of her pregnancy, such as when the fetus was moving and kicking. Mother and Husband's relationship continued to be tense during the pregnancy. However, Mother did not want to file for divorce. Mother told Father she gave Husband divorce papers for Husband to file. Mother discussed with Father how she would need Father to pay her mortgage when Husband left.

Mother eventually stopped communicating with Father when Father began telling Mother he wanted to be present during the baby's birth. Father went to Mother's father's house to tell Mother's father that he would provide for Mother and A.G. Mother's father said Mother warned him Father might stop by, and "he had nothing to say" to Father. The communication between Mother and Father ceased.

4

A.G. was born on April 10, 2010.  Husband was present during A.G.'s birth, and Husband cut the umbilical cord.  Husband is listed as the Father on A.G.'s birth certificate.  Father was not present during the birth.  Father is A.G.'s biological father.  Mother did not notify Father of A.G.'s birth.  On April 17, 2010, Father called Mother.  Mother told Father A.G. had not yet been born and said, "'Don't call me.'"  On April 20, Father learned from another person that A.G. was born on April 10.  Father called Mother again.  Mother told Father that A.G. was "beautiful" and "healthy"; however, Mother would not allow Father to see A.G.  On April 29, 2010, Father filed his petition to establish A.G.'s paternity and obtain visitation.

Mother and Father continued communicating via telephone calls, e-mails, and text messages.  Father continued to ask to see A.G.  Mother told Father, "'Give me time" or . . . 'When the time is right.'"  At the end of June 2010, Mother relented and brought A.G. to a department store to meet Father.  Father spent approximately one hour with the child and purchased bows for her hair.  During the first week of July, Mother, Father, and A.G. went to lunch together, and spent approximately three hours together.  Father attended two of A.G.'s doctor appointments.  Father was present when A.G. received vaccine shots.  Father was introduced at the appointments as A.G.'s father.

Father and Mother spent a Friday together.  Father took care of A.G. while Mother went to a massage appointment.  Father gave A.G. her bottle and changed her diaper.  Father told people A.G. was his daughter.  On another occasion, Father cared for A.G. from 6:00 a.m. to 5:00 p.m., while Mother went to Orange County.  Father

5

took A.G. to his salon, to his house, and out for a walk.  During that time, Father fed A.G., changed her diapers, and changed her clothes.  Father has bottles, diapers, baby lotion, and baby clothes at his house.

During July and August 2010, Mother and Father resumed their romantic relationship.  Mother again told Father that she loved him and they would build a life together.  Mother continued bringing A.G. to Father's house.  Mother instructed Father not to tell people he was visiting A.G.  Mother was often tired, so Father would take care of A.G. while Mother slept.  Father told a neighbor, who sold life insurance, that he needed to obtain an insurance policy from the neighbor for A.G.'s sake.  Father told the neighbor A.G. was his daughter.

Father gave Mother money to purchase a stroller and $100 per week for babysitters.  On August 25, 2010, Father took care of A.G. while Mother was at work.  Father took A.G. to his salon.  Father played with A.G., fed her, and changed her diapers.  When people came into the salon, Father introduced A.G. as his daughter.  At the end of August 2010, Mother discovered Father was telling people he was visiting with his daughter; Mother "cut [Father] off all together" by not allowing Father to contact A.G.

In January or February 2011, Mother contacted Father and requested money.  Father argued with Mother because Mother was not allowing Father to see A.G.  Nevertheless, Father sent Mother a check.  Mother did not cash the check.  A.G. stayed with a babysitter from 7:00 a.m. to 3:00 p.m.  At 3:00, Husband would begin caring for

A.G. Mother would arrive home from work around 6:30 p.m. So from 3:00 to approximately 6:30, Husband took care of A.G.

The family court found Father "exerted meaningful and appropriate efforts to establish a parental relationship with A.G. both before and after her birth." The court found Father missed important moments in A.G.'s life due to Mother's "unilateral action[s]." Further, the court found Husband acted as A.G.'s father "exclusively because the child's biological father was precluded from doing so." The family court ruled Father is A.G.'s presumed father and ordered the parties attend mediation to create a visitation schedule.

On October 17, 2011, Mother filed a petition for writ of supersedeas with this court. Mother sought to stay the family court's order requiring the parties to participate in mediation regarding vistation. Mother asserted that if Father were permitted to visit with A.G. in his home, then Father would be able to show he "receive[d] the child into his home and openly holds out the child as his natural child" (§ 7611, subd. (d)), which Mother argued would "moot the appeal." On December 16, 2011, this court granted Mother's petition for a supersedeas writ, which stayed the trial court's orders pending the outcome on appeal.[2]

---

[2] On December 21, 2011, this court temporarily lifted the stay of the family court's proceedings, but only for the limited purpose of permitting the family court to enter a formal order, so the parties would have the correct order from which to appeal. We lift the stay in its entirety by separate order.

# DISCUSSION

## A.   FILING THE PETITION

Mother asserts Father did not have standing to file the petition because Father filed the petition and then "subsequently develop[ed] the facts that would give him the status of a presumed father."  We disagree.

Standing is an issue of law which we review de novo.  (*Scott v. Thompson* (2010) 184 Cal.App.4th 1506, 1510.)  Section 7630, subdivision (b) provides the following law regarding filing a paternity action:  "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision (d) or (f) of Section 7611.")[3]  "The term 'interested party' includes alleged fathers [citation] . . . ."  (*Said v. Jegan* (2007) 146 Cal.App.4th 1375, 1382; see also *Miller v Miller* (1998) 64 Cal.App.4th 111, 117.)  "California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers. [Citation.]"  (*Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 857.)  "[A] 'biological' or 'natural' father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in . . . section 7611."  (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596.)  "An 'alleged' father refers to a man who may be the father of a child, but whose biological paternity has not

---

[3]  Section 7611, subdivision (d), provides a man can qualify as a presumed father if "[h]e receives the child into his home and openly holds out the child as his natural child."

8

been established, or, in the alternative, has not achieved presumed father status. [Citation.]" (*Ibid.*)

There is no dispute that Father is A.G.'s natural/biological father. As A.G.'s natural father, Father is at the very least an alleged father, if not more than that. Thus, Father qualifies as an "interested party" in this case because an alleged father is an interested party in a paternity action. (*Said v. Jegan*, *supra*, 146 Cal.App.4th at p. 1382; see also *Miller v Miller*, *supra*, 64 Cal.App.4th at p. 117.)

Mother contends Father had to qualify as a presumed father in order to properly bring his paternity petition, which means father would have needed proof, or at least allegations, that he received the child into his home and openly held out the child as his natural child. (§ 7611, subd. (d).) In *In re Dawn D.* (1998) 17 Cal.4th 932, 937-938, our Supreme Court noted that section 7630, subdivision (a) limits "standing to challenge the presumption of a husband's paternity to the child, the child's natural mother, or a presumed father." The Supreme Court went on to note that under section 7630, subdivision (b), any person who is an "interested party" could bring a paternity action, and therefore a person who does not qualify under section 7630, subdivision (a), could possibly bring an action under subdivision (b). (*Dawn D.*, at p. 938, fn. 5.) Given that Father could properly bring his petition under section 7630, subdivision (b) as a natural father, we conclude Mother's argument is unpersuasive—Father did not need to be a presumed father in order to file the paternity action.

B.        MOTION TO DISMISS

1.      *PROCEDURAL HISTORY*

On the day Father filed his petition, he also filed a declaration asserting he paid for Mother's ultrasound and attended the ultrasound appointment. Father also asserted Husband had a vasectomy six years prior to Mother becoming pregnant with A.G. Father complained Mother had not permitted him to see A.G. since A.G. was born earlier that month. On June 7, 2010, Mother filed a "motion to dismiss and quash the paternity action," which appears to be in the nature of a demurrer. (Code Civ. Proc., § 430.10, subd. (b).) Mother argued Father did not have evidence he was a presumed father, and therefore lacked standing to bring the petition.

The family court found there was no dispute Father is A.G.'s biological father. The family court concluded the presumption of paternity in favor of Husband was not conclusive due to Husband being sterile. (§ 7540.) The family court concluded Father "submitted sufficient information in his pleadings to raise salient questions of fact as to central issues in this case. The court does not believe it would be proper or appropriate to deny him the opportunity to present evidence at trial regarding his claims of paternity of [A.G.]" Thus, the family court denied Mother's motion to dismiss.

2.      *ANALYSIS*

Mother contends the family court erred by denying her motion to dismiss because Father could only bring the petition if he were "classified as a presumed father . . . under [section] 7611[, subdivision] (d)." We disagree.

We review demurrers de novo, so we apply the de novo standard to the family court's ruling on Mother's motion to dismiss. (*McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144.) As explained *ante*, an alleged father has standing to file a paternity action. (*Said v. Jegan*, *supra*, 146 Cal.App.4th at p. 1382; see also *Miller v Miller*, *supra*, 64 Cal.App.4th at p. 117.) Therefore, the family court did not err by denying Mother's motion because Father qualified as an alleged father and did not need to prove he was a presumed father in order to obtain standing.

Nevertheless, for the sake of addressing Mother's concerns, we will analyze whether Father would have standing to bring the petition if he needed to qualify as a presumed Father to do so. A man can qualify as a presumed father if "[h]e receives the child into his home and openly holds out the child as his natural child." (§ 7611, subd. (d).) If a father is thwarted from seeing his child after the child is born, then we can consider the father's conduct before the child's birth, "including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child. [Citation.] He must demonstrate a full commitment to his parental responsibilities within a short time after he learned that the biological mother was pregnant with his child. [Citation.] He must also demonstrate a willingness to assume full custody. [Citation.]" (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583; see also *In re Julia U.* (1998) 64 Cal.App.4th 532, 540-541.)

"'A demurrer tests the legal sufficiency of the complaint.'" (*Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 173.) It would be error for a trial

11

court to sustain a demurrer if a petitioner stated a claim under any possible legal theory. (*California Logistics, Inc. v. State* (2008) 161 Cal.App.4th 242, 247.)

In Father's declaration he wrote, "[Mother] did not allow me to be present at our child's birth and has not permitted me to have any contact with our child." Thus, Father asserted he was thwarted from seeing A.G. after her birth. As a result, the court would look to Father's prebirth behavior to determine if he qualified as a presumed father.

In regard to publicly acknowledging paternity, Father alleged he took Mother to her ultrasound appointment and spoke with Husband about being the Father of the child. A finder of fact could conclude that Father publicly acknowledged paternity by confronting Husband and attending the ultrasound appointment. In regard to expenses, Father declared he paid for Mother's ultrasound appointment. Father declared he was not informed when Mother gave birth to A.G. Thus, a trier of fact could conclude Father paid for Mother's pregnancy related expenses when given the opportunity to do so.

Father further declared that A.G. was born in April 2010. Father did not allege an exact date, because Father was not given information about A.G.'s birth. Father's paternity petition was filed on April 29, 2010. In Father's petition he sought joint legal and physical custody of A.G. Given that Father filed his petition for joint custody within the same month of A.G.'s birth, a trier of fact could reasonably conclude Father promptly took legal action to obtain custody of the child.

Father asserted he demonstrated a full commitment to his parental responsibilities within a short time after learning Mother was pregnant with A.G. by

12

declaring (1) he was "thrilled" by the pregnancy; (2) he paid for the ultrasound; (3) he discussed the pregnancy with Husband; and (4) he attended the ultrasound appointment with Mother. A trier of fact could reasonably conclude from these allegations that Father demonstrated a full commitment to his parental responsibilities, because the allegations reflect the behavior of a father who wants to be involved in the child's life. If Father were not fully committed to the child, he likely would not have confronted Husband about the pregnancy.

In Father's petition, he requests joint legal and physical custody of A.G. Father asked the court for "[r]easonable visitation" with the child, and that the child's surname be changed to Father's surname. A reasonable person could infer from these requests that Father would be willing to assume full custody. It appears Father was being reasonable by requesting joint custody, but there is nothing indicating Father would not accept full custody of A.G. if given the opportunity. Given the foregoing analysis, the family court did not err by denying Mother's motion to dismiss, even assuming Father had to be a presumed father to obtain standing.

Mother asserts Father could only have standing to bring the paternity action if he received the child into his home and openly held the child out as his natural child. (§ 7611, subd. (d).) Mother's argument is not persuasive because Father declared he was thwarted from receiving the child into his home, which triggers an alternate legal path to being accorded parental rights, which is detailed *ante*, and involves an examination of the father's actions during the pregnancy. (*In re Elijah V.*, *supra*, 127 Cal.App.4th at p. 583.)

13

Mother asserts the law concerning "thwarting a father from receiving his child into his home" only applies in adoption and dependency cases. Mother contends that this case does not involve an adoption or a dependency, and therefore it is improper to look at Father's conduct during the pregnancy to determine if he had standing to file the paternity petition. Mother is incorrect. The "thwarted father" law, which is derived from the case of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, has been applied in paternity actions. (*J.R. v. D.P.* (2012) 212 Cal.App.4th 374, 888; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018, 1022-1023.)

Mother further asserts that the family court erred because "in its statement of decision and order thereon" it made an incorrect legal conclusion regarding Father's constitutional rights superseding Husband's constitutional rights. Mother does not provide a citation to the record to support this argument. (Cal. Rules of Court, rule 8.204(a)(1)(C).) We have reviewed the family court's written ruling on the motion to dismiss. We have found nothing concerning constitutional law. The only laws cited in the ruling are Family Code sections.[4] We infer Mother is implying that the family court applied the *Kelsey S.* law, which has constitutional underpinnings, to determine that Father had standing. (See *In re J.L.*, *supra*, 159 Cal.App.4th at p. 1023 [discussing the constitutional basis for *Kelsey S.* father status].)

We do not find this argument to be persuasive, because the family court did not need to go through a *Kelsey S.* analysis to determine whether Father had standing to file

---

[4] Constitutional law is mentioned in the ruling on the substantive paternity issue, but not in the ruling on the motion to dismiss.

his petition. As set forth *ante*, Father had standing to file the petition because he is an "interested party," due to his status as the natural/biological father. This court conducted the *Kelsey S.* analysis merely to assuage Mother's concerns that the family court erred if her version of the law was correct. But, as explained *ante*, Mother's version of the law is not correct. We performed the *Kelsey S.* analysis simply to be thorough and address the claims Mother raised, despite Mother's version of the law being incorrect. The law provides: "[t]he term 'interested party' includes alleged fathers [citation] . . . ." (*Said v. Jegan*, *supra*, 146 Cal.App.4th at p. 1382; see also *Miller v Miller*, *supra*, 64 Cal.App.4th at p. 117.) Accordingly, there is no need to analyze whether the juvenile court somehow incorrectly weighed Father's and Husband's constitutional rights pursuant to the constitutional underpinnings of *Kelsey S.*, because it is unlikely the family court engaged in such an analysis, especially since *Kelsey S.* is not cited in the family court's ruling and no constitutional law is cited in the family court's ruling on the motion to dismiss.

### C.     MARRIAGE QUALITY

Mother contends the family court erred by finding Husband took responsibility for A.G. "in an 'attempt to save his marriage.'" Mother provides no record citations to support this contention. (Cal. Rules of Court, rule 8.204(a)(1)(C).) It is unclear if Mother's contention concerns the ruling on the motion to dismiss or the ruling on the substantive paternity issue. We have reviewed both rulings and cannot find any mention of the quality of Mother's and Husband's marriage. In the ruling on the substantive paternity issue, the family court noted Mother and Husband have "marital

concerns," but concluded Mother and Husband's efforts to include A.G. as part of their family unit were "admirable." The court did not pass judgment on the "marital concerns" or offer an opinion on the quality of the marriage. Since we cannot determine the basis of Mother's contention, due to Mother not describing the ruling or providing record citations, we conclude Mother has forfeited the issue for appeal. (*In re Estates of Collins* (2012) 205 Cal.App.4th 1238, 1251, fn. 11 [failure to provide record citations forfeits the issue].)

D.   POLICY

Mother contends the Legislature and the courts have "routinely found there cannot be two presumed fathers," and it is not "possible for [A.G.] to have two fathers on these facts." Mother's argument is unclear, but since Mother does not discuss the evidence or substantial evidence standard, we infer Mother is asserting the family court erred by creating a second presumed father for A.G. and improperly balancing the policies in selecting Father as the sole presumed father.

"Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.' [Citations.] How those competing presumptions are to be reconciled is set forth in section 7612 . . . (b) If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603.) Biological paternity does not always trump father status achieved by virtue of being married to the child's natural mother. (*Id.* at pp. 604-605.) We review the family court's weighing of

16

the policies and exercise of logic under the abuse of discretion standard of review. (*Id.* at p. 606.)

In Husband's favor is the policy of "protect[ing] the integrity of the family unit." (*In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1114.) In Father's favor is the policy of supporting biological parents' relationships with their children. (See *In re Jesusa V.*, *supra*, 32 Cal.4th at p. 606-609 [weighing the relationship policy against the biology policy].) When the child at issue is over two years old, then the court will consider the quality of the relationships the child has with each man. (*In re Kiana A., supra,* 93 Cal.App.4th at p. 1119.) A.G. was 17 months old at the time of the hearing.

In this case, the family court concluded it was "admirable" of Mother and Husband to want to raise A.G. in their home with their other children. The court concluded Husband would be "a loving and caring step[father]" to A.G. In regard to Father, the court found "the developments in this case [were] grossly unfair" to Father, because Father was excluded from taking part in A.G.'s birth and the first 17 months of her life. The court also found Father took every opportunity to act as a father to the child. Thus, the juvenile court concluded the weight of policy and logic "clearly favor a finding that the biological father—[Father]—is the father of [A.G.]"

The family court weighed the evidence and considered the law. The family court's decision is supported by the record, in that the evidence does reflect Father took advantage of every opportunity to act as a father to A.G. For example, Father fed A.G., changed her diapers, and changed her clothes. Given that the family court's decision is within the bounds of reason, we conclude the court did not err. (See *In re Marcelo B.*

17

(2012) 209 Cal.App.4th 635, 642 ["An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination"].)

## DISPOSITION

The judgment is affirmed.  Respondent, Gene M., is awarded his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

HOLLENHORST
Acting P. J.

RICHLI
J.